

U.S. Department of Justice

United States Attorney
Eastern District of New York

FJN/GK/TBM  
F. #2014R01920/OCDETF #NY-NYE-764

*271 Cadman Plaza East*  
*Brooklyn, New York 11201*

July 24, 2023

By Hand and E-mail

**PARTIAL SEALING REQUESTED**

The Honorable Dora L. Irizarry  
United States District Judge  
Eastern District of New York  
225 Cadman Plaza East  
Brooklyn, New York 11201

      Re:    United States v. Dairo Antonio Usuga David  
                 Criminal Docket Nos. 14-625, 23-21 and 23-27 (DLI)

Dear Judge Irizarry:

      The government respectfully submits this letter in advance of the sentencing of the defendant Dairo Antonio Usuga David scheduled for August 8, 2023 at 11:00 a.m. For the reasons set forth below, a sentence of 45 years' or 540 months' imprisonment is sufficient, but not greater than necessary, to achieve the goals of sentencing.

I.      Factual Background

      For almost two decades, the defendant served as a leader of a powerful and violent terrorist, paramilitary, and narcotrafficking organization based in Colombia that engaged in countless acts of violence and was responsible for the widespread distribution of multi-ton shipments of cocaine from Colombia for ultimate importation into the United States. For nearly a decade, the defendant served as the organization's supreme leader.

      By way of background, beginning in 1997, the defendant was a member of the Autodefensas Unidas de Colombia ("AUC"), a Colombian paramilitary and drug trafficking organization that engaged in armed conflict with the Fuerzas Armadas Revolucionarios de Colombia ("FARC"), Colombia's main guerilla group. Presentence Investigation Report dated May 25, 2023 ("PSR") ¶ 51[1]; Tr. Jan. 25, 2023 ("Guilty Plea") at 52:2-13. The AUC's objectives included removing FARC sympathizers from positions of power and influence throughout Colombia. PSR ¶ 51. In 2001, the United States Department of State designated the

---

[1] References to the PSR include the Addendum to the Presentence Report dated July 5, 2023 and the Second Addendum to the Presentence Report dated July 13, 2023.

AUC as a Foreign Terrorist Organization and Specially Designated Global Terrorism Organization.  Id.  By the mid-2000s, many members of the AUC demobilized pursuant to the Colombian government's Justice and Peace process, which required paramilitary members to surrender to the Colombian government and relinquish their criminally derived assets in exchange for reduced sentences and amnesty from extradition.  Id.  Rather than submit to the peace process, co-defendant Daniel Rendon Herrera effectively remobilized the AUC as the Clan del Golfo drug trafficking organization ("CDG," formerly and also known as "Los Urabeños" and "Clan Usuga").  Id.  The defendant briefly demobilized before joining the CDG.  See Guilty Plea at 52:2-24.

The defendant served as a high-ranking leader within the CDG and served as its supreme leader from 2012 to 2021, following Rendon Herrera's capture and extradition to the United States.  PSR ¶ 61.  The CDG was and remains one of the most violent and most powerful criminal organizations in Colombia, and one of the largest distributors of cocaine in the world.  Id. ¶ 52.  With as many as 6,000 members at times, the CDG exercises military control over vast amounts of territory in the Urabá region of Antioquia, and employs military tactics and weapons to reinforce its power against rival drug traffickers, paramilitary organizations, and Colombian law enforcement authorities who threaten the CDG's control.  Id.

The CDG funds its activities primarily through a multi-billion-dollar drug trafficking operation, charging fees for every kilogram of cocaine manufactured, stored, or transported through areas controlled by the organization and by exporting its own cocaine, including to the United States.  Id. ¶ 53.  The defendant controlled cocaine manufacturing facilities and used the CDG's extensive distribution network to export cocaine for his own personal profit.  Id. ¶ 65.  In connection with his guilty plea, the defendant has acknowledged that at his direction, the CDG collected taxes on at least 96,856 kilograms—or 96.856 tons—of cocaine.  Id.  The magnitude of the defendant's personal profit from this sweeping drug trafficking enterprise is evidenced by the fact the defendant has consented to a staggering $216,000,000 forfeiture money judgment in the instant case.  See Plea Agmt. ¶ 8.

During his reign, the defendant oversaw all the CDG's activities and directed its members to engage in extensive criminal acts.  The defendant and the CDG used violence to, among other things: (1) protect CDG members from arrest and prosecution, silence potential witnesses, and retaliate against law enforcement authorities and those assisting law enforcement; (2) maintain discipline among CDG members and associates; (3) promote and enhance the prestige, reputation, and position of the CDG with respect to rival criminal organizations; (4) preserve, protect, and expand the CDG's power and territory; and (5) finance the CDG's operations and enrich its leaders through the collection of drug debts.  See PSR ¶¶ 54, 61, 64.  To help carry out this violence, the defendant and the CDG employed a veritable army of "sicarios," or hitmen, who kidnapped, tortured, and murdered competitors and those deemed traitors to the organization, as well as their family members.  See id. ¶¶ 54, 61.

The defendant's reign over the CDG was marked by violence and vengeance.  For example, in early 2012, after the defendant's brother, Juan de Dios Usuga David (also known as "Giovanni"), was killed in a police raid, the defendant ordered a multi-day shutdown, or "strike," on towns and communities within the CDG's control.  Id. ¶ 62.  Residents remained at home and business owners kept their establishments closed under fear of execution.  Id.  On a separate

occasion, at the defendant's instruction, a CDG member—who was believed to have provided information to a rival drug trafficking organization run by Daniel Barrera Barrera—was tortured, buried alive, and beheaded post-mortem for his perceived disloyalty.  Id.

Moreover, at the defendant's direction, the CDG carried out organized campaigns, referred to as "Plan Pistolas," to kill Colombian law enforcement and military personnel, for which purpose they used military-grade weapons, including grenades, explosives, and assault rifles.  Id. ¶ 64.  The defendant offered bounties for the murder of Colombian police officers and military personnel to intimidate law enforcement authorities and prevent them from capturing him or interfering in the CDG's business.  Id.  Indeed, following the defendant's extradition in connection with the instant case, the CDG embarked on an armed shutdown of 11 of Colombia's 32 regional departments, which resulted in five murders—including of two police officers and one solider—as well as attacks on police stations and blockages of roadways and public transportation systems.

Further, the defendant's organization made numerous attempts to assassinate individuals who were believed to be cooperating with law enforcement, including in connection with the instant case.  See id.  For example, CDG members attempted to poison a potential government witness with cyanide while that individual was imprisoned in Colombia and also attempted to assassinate the witness's foreign attorney.[2]  Id.

For years, the defendant evaded capture by methodically moving through a network of rural safe houses.  See id. ¶ 60.  The defendant was ultimately captured on October 23, 2021, in a hideout in Antioquia province, Colombia, near the Colombia-Panama border, following an extensive, massive, and unprecedented operation by Colombian military and law enforcement personnel.  See id.

II.     Procedural History

The defendant has been separately charged in at least three districts, beginning as early as 2009, and prior to his extradition to the United States, numerous superseding indictments were filed adding charges and violations against him.  See United States v. Dairo Antonio Usuga David, 04-CR-962 (LAP) (S.D.N.Y.); United States v. Dairo Antonio Usuga David, 14-CR-625 (DLI) (E.D.N.Y.); United States v. Dairo Antonio Usuga David, 15-CR-20403-WPD (S.D. Fl.).

As relevant here, on July 16, 2009, a grand jury sitting in the Southern District of New York returned a Third Superseding Indictment against the defendant (the "SDNY Indictment").  Count Two charges that between 1998 and 2009, the defendant conspired to

---

[2]    The defendant's penchant for retaliation against those who opposed him or the CDG was not limited to human beings.  Indeed, under the defendant's leadership, the CDG was reported to have offered a bounty of 200 million Colombian pesos, nearly $70,000 U.S. dollars, for the life of a Colombian counter-narcotics police dog who had aided in significant seizures and arrests.  See, e.g., "Colombian Drug Traffickers Put a $70,000 Bounty on a Police Dog," N.P.R. (July 27, 2018), available at https://www.npr.org/2018/07/27/633039986/colombian-drug-traffickers-put-a-70-000-bounty-on-a-police-dog (last visited July 16, 2023).

3

import five kilograms or more of a substance containing cocaine into the United States, in violation of Title 21, United States Code, Sections 812, 952(a), 963 and 960(b)(1)(B). See PSR ¶ 48; ECF 23-CR-27 (DLI) Dkt. No. 1.

On November 2, 2021, a grand jury sitting in the Southern District of Florida returned a First Superseding Indictment against the defendant (the "SDFL Indictment"). Count One charges that between 2002 and 2021, the defendant conspired to import five kilograms or more of a substance containing cocaine into the United States, in violation of Title 21, United States Code, Sections 963 and 960(b)(1)(B). Count Two charges that between 2009 and 2021, the defendant conspired to distribute five kilograms or more of a substance containing cocaine on a vessel subject to the jurisdiction of the United States, in violation of Title 46, United States Code, Section 70506(a) and Title 21, United States Code, Section 960(b)(1)(B). See PSR ¶ 48; ECF 23-CR-21 (DLI) Dkt. No. 1.

On November 4, 2021, a grand jury sitting in the Eastern District of New York returned a Fourth Superseding Indictment against the defendant (the "EDNY Indictment"), with three counts, each spanning 2003 to 2021. The EDNY Indictment charges the defendant in Count One with engaging in a continuing criminal enterprise ("CCE"), in violation of Title 21, United States Code, Sections 848(a) and 848(c), predicated on 45 violations, for his role as the leader of the CDG. Count Two charges the defendant with participating in an international conspiracy to manufacture and distribute cocaine, knowing and intending that the narcotics would be illegally imported into the United States, in violation of Title 21, United States Code, Sections 959(d), 960(b)(1)(B)(ii) and 963. Count Three charges the defendant with use of firearms in furtherance of his drug trafficking crimes, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(i), 924(c)(1)(A)(ii), 924(c)(1)(A)(iii) and 924(c)(1)(B)(ii). See PSR ¶¶ 1-47.

On May 4, 2022, Colombia extradited the defendant to the United States to face charges on the EDNY Indictment—specifically, Count One, Violations One through Forty-Four, and Count Two—as well as the SDFL Indictment and SDNY Indictment. See id. ¶ 60.

On May 5, 2022, the defendant was arraigned before the Honorable Vera M. Scanlon, United States Magistrate Judge for the Eastern District of New York. See ECF 14-CR-625 Dkt. No. 150. Judge Scanlon entered a permanent order of detention and, since that time, the defendant has been incarcerated at the Metropolitan Detention Center ("MDC") in Brooklyn, New York.[3] See id. Dkt. No. 152.

In January 2023, upon the defendant's consent and in anticipation of his entering a guilty plea, the SDFL Indictment and SDNY Indictment were transferred to this District,

---

[3] Since May 18, 2022, the defendant has been incarcerated pursuant to Special Administration Measures ("SAMs"), as approved by Deputy Attorney General Lisa Monaco and Deputy Assistant Attorney General Jennifer Hodge. SAMs were deemed appropriate given, among other things, the defendant's prior use of third parties to carry out acts of violence against potential witnesses and those deemed disloyal, and to exercise control over the CDG.

4

pursuant to Rule 20 of the Federal Rules of Criminal Procedure, and assigned Docket No. 23-CR-21 (DLI) and Docket No. 23-CR-27 (DLI), respectively.

On January 25, 2023, the defendant pled guilty before Your Honor pursuant to a plea agreement (the "Plea Agreement"). Specifically, the defendant pled guilty to Count One of the EDNY Indictment, charging the defendant with engaging in a CCE, which carries a minimum term of 20 years' imprisonment and a maximum term of life. See PSR ¶ 66. At the same appearance, the defendant pled guilty to Count Two of the SDFL Indictment, charging a maritime narcotics conspiracy, and Count Two of the SDNY Indictment, charging a narcotics importation conspiracy, each of which carry a minimum term of 10 years' imprisonment and a maximum term of life. See id. ¶¶ 67-68.

III.   The Sentencing Guidelines

The government agrees with the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") calculation set forth in the PSR, which yields a total combined offense level of 54, Criminal History Category I, and an applicable Guidelines range of life imprisonment, as set forth below. See PSR ¶¶ 75-104.

SDFL & SDNY Indictments: Maritime Narcotics Conspiracy & Narcotics Importation Conspiracy

| | |
|---|---|
| Base Offense Level (More Than 450 Kilograms of Cocaine (§§ 2D1.1(a)(5), 2D1.1(c)(1))) | 38 |
| Plus: Possession of Dangerous Weapon (§ 2D1.1(b)(1)) | +2 |
| Plus: Use of Violence (§ 2D1.1(b)(2)) | +2 |
| Plus: Use of Semi-Submersible Vessel (§ 2D1.1(b)(3)(B)) | +2 |
| Plus: Bribery of Law Enforcement Officials (§ 2D1.1(b)(11)) | +2 |
| Plus: Maintained a Premises for Purpose of Manufacture or Distribution (§ 2D1.1(b)(12)) | +2 |
| Plus: Aggravating Role (§ 2D1.1(b)(16)) | +2 |
| Plus: Role Adjustment (§ 3B1.1(a)) | +4 |
| Subtotal: | 54 |

<u>EDNY Indictment: Continuing Criminal Enterprise</u>

| | |
|---|---:|
| Base Offense Level<br>(More Than 450 Kilograms of Cocaine (§§ 2D1.5(a)(1), 2D1.1(a)(5), 2D1.1(c)(1))) | 42 |
| Plus: Possession of Dangerous Weapon (§ 2D1.1(b)(1)) | +2 |
| Plus: Use of Violence (§ 2D1.1(b)(2)) | +2 |
| Plus: Use of Semi-Submersible Vessel (§ 2D1.1(b)(3)(B)) | +2 |
| Plus: Bribery of Law Enforcement Officials (§ 2D1.1(b)(11)) | +2 |
| Plus: Maintained a Premises for Purpose of Manufacture or Distribution (§ 2D1.1(b)(12)) | <u>+2</u> |
| Subtotal: | <u>52</u> |

| <u>Grouping Analysis (§§ 3D1.2, 3D1.4)</u> | Units | Level |
|---|:---:|:---:|
| Highest Offense Level (SDFL & SDNY) | 1 | 54 |
| Total Combined Offense Level | | <u>54</u> |

The defendant receives a reduction of three points for acceptance of responsibility, resulting in a total adjusted offense level of 51. <u>Id.</u> ¶ 102-04. Because the total adjusted offense level of 51 exceeds the maximum offense level under the Guidelines, the offense level in this case is to be treated as level 43. U.S.S.G. Ch. 5, Pt. A, Cmt. n.2; PSR ¶ 104. The defendant stipulated to the Guidelines calculation. Plea Agmt. ¶ 4.

Notwithstanding that both the statutory maximum and Guidelines range applicable to this case are life imprisonment, pursuant to the terms of the Plea Agreement, and as agreed upon between the governments of the United States and Colombia in connection with the defendant's extradition, the government does not seek a sentence of life imprisonment. <u>See id.</u> ¶¶ 1(a) n.1, 7(b).

IV.   <u>Discussion</u>

The government respectfully seeks a sentence of 45 years' imprisonment primarily on account of the defendant's decades-long leadership positions within the CDG, a violent Colombian terrorist and paramilitary organization, and the massive quantity of cocaine the defendant is responsible for trafficking, which furthered the CDG's unlawful objectives. As set forth below, consideration of the factors set forth in Title 18, United States Code, Section 3553(a) warrants such a sentence.

A. <u>Nature and Circumstances of the Offense, and History and Characteristics of the Defendant</u>

The defendant's brutal reign as supreme leader of the CDG, during which staggering quantities of cocaine were distributed for ultimate importation into the United States, warrants the requested sentence.

For almost two decades, the defendant exercised a leadership position within the CDG. He maintained both his leadership position within the organization, and the organization's position as one of the largest distributors of cocaine in the world, through violent and unyielding conduct, including obstruction of justice. He ordered the killing, kidnapping, and torture of rivals, as well as individuals he believed were cooperating with law enforcement against his personal interests and the CDG. He targeted civilians and law enforcement personnel, as well as their respective families. He terrorized communities in the Urabá region of Colombia, at times ordering civilians to stay home and business owners to keep their establishments closed under fear of execution. He attempted to poison a potential government witness with cyanide and, not stopping there, also attempted to murder that person's lawyer.

The defendant's desire for control and revenge simply cannot be overstated, nor can the degree of harm he inflicted, both in the United States, through the CDG's unceasing importation of cocaine, and in Colombia, through his reign of terror. Accordingly, the requested sentence appropriately reflects both the nature and circumstances of the offense, and the defendant's history and characteristics.

B. <u>The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense</u>

The defendant's offenses of conviction were massive in scale. For example, the defendant is responsible for trafficking and conspiring to traffic more than 96,856 kilograms of cocaine. This quantity of cocaine exceeds the threshold amount for the greatest possible offense level under the Guidelines, which is 450 kilograms, by several orders of magnitude. The seriousness of the defendant's conduct is also underscored by the fact that the Guidelines do not even contemplate the extent of his culpability—his total adjusted offense level falls off the Sentencing Table. And the fortune he amassed while running this paramilitary, narcotrafficking organization for almost two decades is signified by the defendant's consent to the entry of a $216,000,000 forfeiture money judgment. In the circumstances, the requested sentence is sufficient, but not greater than necessary.

The need to promote respect for the law is also particularly acute here. Through the Colombian government's Justice and Peace process, the defendant was afforded a generous and lawful means to demobilize. However, the defendant rejected the rule of law. Instead, the defendant briefly demobilized and decided that a peaceful, non-violent existence was not for him. The defendant rejoined Daniel Rendon Herrera and others who rejected the demobilization process and he became one of the CDG's leaders. The defendant's ambitions, however, even exceeded those of Rendon Herrera. Rendon Herrera co-founded the CDG and its violent narcotics trafficking and killing machine. The defendant refined, expanded, and perfected upon the foundation laid by Rendon Herrera. At its peak, under the defendant's leadership, the CDG

7

had upwards of 6,000 members, controlled large swaths of Colombia, and used violence with impunity. To this day, under the leadership of the defendant's former lieutenants, the CDG remains one of the world's largest and most powerful drug trafficking organizations.

To his credit, the defendant has accepted responsibility for his crimes since being extradited to the United States. For that acceptance of responsibility, the defendant has appropriately received a three-level reduction in his offense levels pursuant to the Guidelines. However, that is as far as credit is due. ███████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████

Likewise, to the extent the defendant argues for leniency in sentencing by virtue of the strict conditions of confinement to which he has been subject under the SAMs, those arguments should be rejected. The SAMs were necessary to adequately protect, among others, potential witnesses given the defendant's demonstrated penchant for revenge against those deemed disloyal. It would be perverse indeed if the fact such conditions were necessary in light of the defendant's violent history somehow swung in favor of leniency at sentencing.

    C.    <u>The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct</u>

The defendant's lengthy history of widespread criminal activity requires a significant sentence that will promote general deterrence. Over almost two decades, the defendant used a violent terrorist and paramilitary organization to facilitate the importation of tons of cocaine, worth tens of millions of dollars, into the United States. A sentence of 45 years' imprisonment is necessary to send a message to paramilitary and cartel leaders who import cocaine into the United States for personal, political, and financial gain that their criminal conduct will not be tolerated; they will be arrested, extradited, and face significant punishment.

    D.    <u>The Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant</u>

The defendant's commitment to narcotics trafficking and violence ceased only because he was captured—after a years-long, extensive operation by Colombian military and law enforcement personnel—and brought to justice. This fact weighs heavily in favor of imposing the requested sentence.

The government acknowledges that the defendant has been in custody since his capture. Specifically, the defendant was captured in Colombia on October 23, 2021 and held until his extradition to the United States on May 4, 2022. Additionally, the defendant has been detained in the United States since his arraignment on May 5, 2022. The government expects that the U.S. Bureau of Prisons will give the defendant credit for time served since October 23,

2021 against the sentence imposed by Your Honor, and the government concurs that such would be appropriate here.[4]

  E. <u>The Need for the Sentence Imposed to Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner</u>

   To the extent that the defendant argues that his various medical conditions warrant leniency at sentencing, the government submits that the federal medical centers within the BOP are adequately equipped to address those concerns. Notably, the PSR details the defendant's medical conditions, which include ███████████████████████████ ███████ See PSR ¶ 126 (listing medications administered in connection with the defendant's diagnoses). Further, ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ Id. ¶ 129. Accordingly, the defendant's medical conditions do not appear to require such specialized care that they cannot be appropriately addressed by BOP facilities.

  F. <u>The Kinds of Sentences Available</u>

   Independent of the 20-year mandatory minimum applicable here, the Section 3553(a) factors make plain that any non-incarceratory sentence would be inappropriate.

   However, pursuant to the terms of the Plea Agreement, and in light of the overlapping nature of the charges in the EDNY, SDFL, and SDNY Indictments, and the

---

[4] Title 18, United States Code, Section 3585(b) provides, in relevant part, that a "defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences-- (1) as a result of the offense for which the sentence was imposed; or (2) as a result of any other charge for which the defendant was arrested after the commission of the offense for which the sentence was imposed." The Supreme Court has held that the BOP is "the agency charged with administering the credit statute," <u>Reno v. Koray</u>, 515 U.S. 50, 60 (1995), and that § 3585(b) does not authorize a district court to award such credit at sentencing, <u>see</u> <u>United States v. Wilson</u>, 503 U.S. 329, 333-335 (1992) ("Congress has indicated that computation of the credit must occur after the defendant begins his sentence. A district court, therefore, cannot apply § 3585(b) at sentencing.").

   The Supreme Court has also held that "credit for time spent in 'official detention' under § 3585(b) is available only to those defendants who were detained in a 'penal or correctional facility,' § 3621(b), and who were subject to [Bureau of Prisons] control." <u>Reno</u>, 515 U.S. at 58; <u>see also id.</u> at 56 (noting as correct the interpretation that "the phrase 'official detention' in § 3585(b) refers to a court order detaining a defendant and committing him to the custody of the Attorney General for confinement"). However, the government has conferred with BOP officials and has been advised that it is the general practice of the BOP to award credit to defendants who were detained in foreign custody prior to entering into the custody of the Attorney General if they were detained pending extradition, rather than on local charges.

relationship between the conduct underlying the defendant's offenses of conviction, the government recommends that the sentences imposed on the counts of conviction run concurrently.  See Plea Agmt. ¶ 7(c).

    G.    <u>The Need to Avoid Unwarranted Sentence Disparities Among Similarly Situated Defendants</u>

The requested sentence of 45 years' imprisonment would avoid unwarranted sentencing disparities between similarly situated defendants.  Most pertinent, on October 17, 2022, this Court sentenced co-defendant Rendon Herrera to 35 years' or 420 months' imprisonment for creating the terrorist, paramilitary, narcotrafficking organization that the defendant later ran and made flourish under his reign as of terror.  See PSR p. 3.  As explained above, the defendant's criminal conduct exceeds even that of Rendon Hererra.  Courts across the country have imposed similar sentences on drug cartel and paramilitary leaders, and senior narcotraffickers.  See, e.g., <u>United States v. Henry de Jesus Lopez Londoño</u>, No. 10-CR-20763 (JAL) (S.D. Fl.) (high-ranking member of the AUC and CDG subordinate to the defendant, "Mi Sangre," convicted at trial of cocaine importation conspiracy in connection with tens of thousands of kilograms of cocaine, principally sentenced on June 18, 2018 to 372 months' imprisonment); <u>United States v. Daniel Barrera Barrera</u>, Nos. 07-CR-862/15-CR-211/15-CR-492 (GHW) (S.D.N.Y.) (violent narcotrafficker, "Loco Barrera," responsible for manufacturing and trafficking hundreds of tons of cocaine through both FARC- and AUC-controlled territory for importation into the United States and elsewhere, convicted on multiple counts of cocaine importation and money laundering conspiracy, principally sentenced on July 25, 2016 to 420 months' imprisonment); <u>United States v. Diego Fernando Murillo Bejarano</u>, No. 03-CR-1188 (RMB) (S.D.N.Y.) (former de facto leader of the AUC, "Don Berna," convicted of cocaine importation conspiracy principally sentenced on April 22, 2009 to 375 months' imprisonment); <u>United States v. Joaquin Archivaldo Guzman Loera</u>, No. 19-CR-775 (BMC) (E.D.N.Y.) ("El Chapo," sentenced to life imprisonment plus 30 years after trial conviction for being a principal leader of the Sinaloa Cartel).

These sentences illustrate that the requested sentence of 45 years' imprisonment would not result in unwarranted disparity, and is sufficient, but not greater than necessary, to achieve the goals of sentencing.

V.      Conclusion

For the reasons set forth above, the government respectfully submits that, based on the factors set forth in Section 3553(a), a sentence of 45 years' or 540 months' imprisonment is reasonable and appropriate in this case.

                                            Respectfully submitted,

                                            BREON PEACE
                                            United States Attorney

By:      _____
                                            Francisco J. Navarro
                                            Gillian Kassner
                                            Tara B. McGrath
                                            Assistant United States Attorneys
                                            (718) 254-7000

cc:     Alexei Schact, Esq. (by e-mail)
       Paul Nalven, Esq. (by e-mail)
       United States Probation Officer Erica Vest (by e-mail)